Auden Life Insurance Company. All righty, whenever you're ready, Mr. Williams. Thank you, Your Honors. May it please the Court, I'm Clay Williams on behalf of Brittany Finney. This case is about adherence to precedent, and the issue before this Court is whether the MetLife's application and interpretation of the physical illness exclusion found within the FEGLI's accidental death coverage is governed by this Court's holding in Dixon v. Life Insurance Company of North America. District Court erred when it failed to apply Dixon, notwithstanding the same language being at issue in that case and in this case. But here's the problem, right? There are a couple problems. One is Dixon is an ERISA case, right? Yes, Your Honor. All right. And the FEGLI statute has different language and a different structure, doesn't it? From ERISA, yes, Your Honor. Yes. And under the FEGLI statute, we're required to comply with the contract, and the contract here has specific language that requires the conclusion that the cause of death is solely from the accident, as opposed to some contributing medical factor, you know, physical illness type whatever. And here, the record shows, no matter whose opinion we rely on, that we can't say that it was solely from the broken leg. That's the problem. I don't know if you, at least for me, if you want to address that, I'll be happy to see what I'm missing here. Well, yes, Your Honor. I think it comes down to the purpose of insurance. And whether it's individual or private coverage, or whether it's ERISA-governed coverage, or whether it's FEGLI coverage, the goal of insurance is to provide coverage, and that coverage has to be meaningful. But I understand what you're saying, and, you know, I sympathize with your client. I mean, it's very unfortunate that it doesn't appear that there's coverage here. But we still have to comply with the FEGLI statute. And the FEGLI statute tells us we have to comply with the contractual language. So I think in order for you to win, you need to show us either that somehow I've missed something in the FEGLI statute, or that somehow the opinions in this case show that the death resulted solely from the broken leg. Well, Your Honor, I guess the problem, as when I looked at this case, that I am unable to reconcile, which is why we argue that Dixon applies, is that the same thing could be said in the Dixon case, except you're not dealing with a statute, you're dealing with a plan, an insurance policy that's treated as a planned document. But there's a difference, right? I mean, under ERISA, you have a number of different employers. You know, under FEGLI, it's strictly the federal government and the administrator it selects, right? And so when the FEGLI statute says what's going to happen, it's going to apply in every single policy. So it is different from the ERISA statute. Well, yes, Your Honor, I agree about the statutes being different, but the point that I was meaning to make was that even when you have an ERISA plan, and a court or an administrator is interpreting an ERISA plan, they go by the terms of the plan. The terms of the plan are not amended or superseded by court unless they're inconsistent with some provision within ERISA. And there was nothing like that that occurred in Dixon. What the court did in Dixon was take the terms of a plan and read those terms in a way to effectuate coverage, came up with, or not came up with, but adopted the substantially contributed to interpretation of those plan terms to vindicate the goals of the coverage. In other words, to make it meaningful, or in Your Honor's words in Bradshaw, quoted from Dixon, the substantially contributed test gives the exclusionary language reasonable content without unreasonably limiting coverage. And so here we have the same intent with the FEGLIA statute and regulations which set forth these terms. The goal was to provide insurance, provide low-cost group life insurance to federal employees in 1952. But here's the problem. Here's the text of the FEGLIA Act, okay? Yes, Your Honor. It says, quote, the provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits, including payments with respect to benefits, shall supersede and preempt any law of any state or political subdivision thereof or any regulation issued thereunder which relates to group insurance to the extent that the law or regulation is inconsistent with the contractual provisions. And it also says that in another section that the contractual provisions will govern. So how do you get around those parts of the FEGLIA Act? Your Honor, I guess with a simple answer that that preemption doesn't apply. The preemption applies when there's... Preemption doesn't apply to the federal part. But there's another provision with, right, it applies to any kind of state provisions. But there's another part of the FEGLIA statute which says that we have to comply with... We have to comply with the contract language. Yes, Your Honor. And that's the part of, and I'll say preemption more global term, but that's the part of preemption where preemption applies where, like for instance in state law context, if a state law regulation is inconsistent with a federal law. So for that to be the case here, the argument that Medline is putting forth is that substantially contributed to interpretation is inconsistent with the language in FEGLIA. Well for that to be the case, then you have the transitive property in Dixon which is the problem, the reconciliation problem. And... But what is the problem? Where is there a reconciliation problem? Because if we look at the FEGLIA regulations, Section 870.101 specifies with respect to accidental death that... And Section 2.8b of the FEGLIA contract here also says that the benefits, quote, shall be paid when an eligible employee sustains bodily injuries solely through violent external and accidental means and not more than one year thereafter suffers any of the losses specified in this section as a direct result of such bodily injuries and independently of all other causes. I mean, we would have to invalidate that language. That's the problem here. So how do we, unless I'm missing something, how do we get around that language here? I see your question, Your Honor. There's a... The way... So that part of that overall provision where the event of death may occur within one year, there is an intent within that provision that is basically a tolerance for attenuation that can happen between the accident and the ultimate event. And it's the same kind of language that this court actually examined in Dixon. But... I would actually encourage you to think about staying away from Dixon because I think probably all of us are going to be caught up on the ERISA FEGLIA distinction. I would say, tell us how under the specific contractual language here, which is similar but a little bit different, that your client satisfies this, which I think you're about to do. I would stay away from Dixon and just tell us why this is from sustaining bodily injury solely through violent, external, and accidental means. Well, it's difficult to imagine that when Congress, when passing FEGLIA, wanted to create a coverage that only applied to the most perfectly healthy people, where they would be the only ones to possibly have this benefit, where it's built into this, where this intent comes into this, is that one year, that sort of one year that can happen between the accident and the death. In other words, death doesn't have to be immediate. Death often occurs when you have a point of accident, you have the instrumentality, and then you have things that happen that lead to death, as long as there is a fairly direct path between those things, like there was in Wells v. Minnesota Life. That's a case where the Fifth Circuit addressed an issue arising out of Texas that dealt with a mosquito bite, and the person contracted West Nile, and there was complications from a mosquito bite that killed that person on down the road. I think it's the same situation here, Your Honor, and that's where this allowance for substantially contributed to analysis, that's where that comes in. Because, again, it's about vindicating the purpose of the coverage, and just touching on Dixon, because I understand Your Honor's admonition about that, but these were really the same issues that were there in the court in that instance, didn't come up with an interpretation, didn't really even address this, saying that their analysis was inconsistent with plan terms. They weren't even saying they were rewriting plan terms based on risk. Here's what might, I think, be a better answer, and I'll be interested to hear what counsel on the other side thinks of this. Was Ms. Anderson's bodily injury, her broken ankle, I think, solely through violent external and accidental means? That injury. Did that injury qualify as being sustained solely through violent external and accidental means? That was her accident, yes, Your Honor. Yes. And then, separately, as a direct result of that injury, independently of all other causes, I think may be a problem for you, but as a direct result of the bodily injury, and within one year afterwards, did she lose her life? I think a question for you, to me, the solely clause is already satisfied because the accident caused the knee, or the ankle problem, right? But did that ankle, broken ankle, directly cause her death? I think that's the question that the insurance contract asks. Yes, Your Honor. So the case that would address that is the Wells case that I just mentioned, where you have, in this case, you have the broken bones, which led to a surgery to repair that. She was not able to take anticoagulants because of her underlying health conditions. But because she, but because of the, she threw, had a pulmonary thromboembolism after that surgery as a complication of that surgery, which is not unexpected when someone has that surgery, this happens. That's what, that's what ultimately killed her. So complications, this is where Wells addresses this, complications arising from an accidental injury are not concurrent, proximate causes. So this, there is a chain there. Now is it a perfect chain? No, Your Honor. I admit that. There's not. She, she was not in perfect health, but that's also kind of the point where substantially, the substantially contributed to analysis, as court has applied in a different context, applies. And that's, that's where this tolerance for attenuation that I mentioned with this one year thing, that's where this intent sort of is embodied. Do I wish it was worded differently, this policy? I absolutely do because it feels like an illusory coverage unless there's some, there's some, there's some way to retreat from MetLife's interpretation of this, which can't possibly be what Congress intended. I mean, does direct causation mean but-for causation? Does it mean proximate causation? Does it mean some other type of causation? How would you, how would you have the court interpret the word direct? I would have approximate causation, Your Honor. Approximate causation. Something that's set, that sets the chain in motion, but has a meaningful effect on it. So here you would say that her broken bone was the proximate cause of her death because, if not for that, that was what set all these consequences in motion. Even if she was a more fragile patient than some, if I get a broken ankle, God forbid, hopefully that will not ultimately result in my death because I have better cardiovascular health and whatnot, right? But for her, that ankle, that ankle injury was the proximate cause of everything that  Is that your argument? Yes, Your Honor. Okay. All right. Thank you. And you've reserved three minutes for rebuttal. We'll hear next from Mr. Smith. Thank you. May it please the Court. To get directly to my opponent's position, this is not MetLife's interpretation. As Judge Rosenbaum has indicated, this is an OPM contract. I think the most critical statute is 8704. I have a statutory appendix at the back of the red brief. But 8704 directs OPM to approve the conditions and limitations for accidental death coverage. And so this is an act that has been around for 20 years earlier than Eris. It was passed in 1954. OPM wrote this contract. MetLife is simply the administrator of this contract. Judge Rosenbaum has read the coverage and exclusions provisions, so I won't get into that. Adding substantial here would rewrite OPM's contract. And that's inappropriate under this Court's earlier precedent in O'Neill. OPM's language and intent are clear, and it's not for this Court to change it, even if the result might be harsh as it was in O'Neill. The OPM contract is congressionally authorized policymaking on the part of OPM for every federal civil employee of the country. And this Court should defer to that policymaking under Loper-Bright. That has not been changed by Loper-Bright. Policymaking deference is still the law of the land, and this is literally the law of the land. OPM wrote this contract, and the Court should defer to its definition. My question, though, is what does this contract say about causation? Right? Because I haven't seen an OPM regulation defining what it means for the injury to directly cause the person's injury or death, right? So what do we know about what OPM thinks about that legal question? I think it's not a regulatory question. It's OPM's policymaking, and they wrote the contract. Right, but I'm looking at the contract, and I'm saying, what does the contract mean? So it means... What does as a direct result... It means that Ms. Anderson's death had to have been a direct result, independent of any other cause of the accident. Right, but what does direct result mean? Do you think it doesn't mean proximate cause, or it certainly doesn't mean but for? I think she would easily satisfy but for. Yes. When you're administering a benefit like this for all federal civilian employees nationwide, you're not doing a philosophical investigation of Paul's graph. This is a result of looking at the totality of the medical file, and if the medical records don't provide clarity, you hire an independent medical examiner to determine whether in this case Ms. Anderson's pulmonological or lung issues contributed in any way to her death. And the autopsy report in this case makes it clear that the answer to that question is absolutely yes. The independent medical examiner concluded the same. And Dr. Lauridsen, who was hired by the plaintiffs to give an opinion, has nothing to say in his opinion about her pulmonary problems, her lung problems. She had COPD. She had interstitial lung disease. She had pneumonia in the hospital. She had been there since the 24th of June. She died on the 30th. She had low reserve, meaning she had portions of her lungs that were inoperable, meaning they were not perfusing oxygen into her blood. And all of the medical evidence shows that her lung issues, her lung disease, contributed to her death because of this embolism. And MetLife looked into that and... But are you saying that the embolism wouldn't have happened? Let me back up. Are you saying that the contention is not that her broken bone had nothing to do with it, right? Correct. But so what, I guess my question remains, it sounds like you think that it would be satisfied, but do you think that direct cause means proximate cause or something else? Her death, it's not the accident, her death had to directly result from the accident. From the injury, according to the terms of the plan. From injuries solely caused by an external violent accidental event, those are the injuries that were suffered if we're talking about the causation clause, the coverage clause. The injury here, would you agree, was solely caused by the accident? I think the injury was solely caused by the accident. Right. But then we go to the second question, which is whether that injury directly caused her death. She suffered death directly as a result, independent of any other cause, and in any way is the exclusion. I was actually going to ask you a question about that, I'm glad you got to the exclusion. Is this a case where the claim fails the causation clause, or is this a case where maybe the claim satisfies the causation clause, but it fails because of the exclusion? So the exclusion says, not only do you have the, that has to be a direct result of bodily, such bodily injuries, and independent of all other causes, then it also has the exclusion that says, we also exclude coverage if the death, quote, in any way results from, is caused by, or is contributed to by a physical illness. So which one is this case, do you think? I think in the Venn diagram, Judge Brasher, those two circles are largely overlapping in this particular case. I think the administrator in this case decided to deny benefits under both the coverage provision and the exclusion provision. Judge Mays upheld MetLife's determination on just the exclusionary language because it's not really a Paul's graph analysis as much as it is a medical analysis, and MetLife is entitled and given discretion to make that decision based upon all of the medical evidence, and if that decision is reasonable, it's to be upheld, and we would ask the court to affirm for that reason, but I... Well, the reason I ask is it seems like the exclusion is actually a little bit broader in taking things away than coverage. So the coverage says, solely through accidental means, independently of all other causes, but then the exclusion says, even if it's merely contributed to by a physical illness, it's excluded. So, couldn't you, maybe this case is kind of, it's a wash, but I mean, couldn't you envision a scenario where someone, their injury sort of fits, number one, as like a causal matter, and it's sort of, it's caused by the accident solely, but yet the death still was contributed to by some physical illness, and so it goes under the exclusion clause. Is that like, yeah, the Venn diagram, how does that work, right? I mean, that would be a different medical scenario. The flip side of that, which I think the court is worried about, is something that my opponent has raised, which is, what if you have a physical condition that is one-half of one percent? Say someone's diabetic, and their lab results show a high A1C level at one point during the acute stay, and they die for some other reason, say, you know, again, an embolism. That would not be a reasonable conclusion, because that high A1C at one point in the acute stay did not contribute to the death. It's just something in the medical record. What if someone who's perfectly healthy is in an accident, and when they go into surgery, they're given a common antibiotic, and it turns out that, unbeknownst to anyone, they had a life-threatening allergy to that antibiotic, and they die? What, is that a, is that a, is that independently of all other causes, or would that, would coverage be denied there because that, their death was actually caused by the antibiotic rather than the injury? I don't know how MetLife would deal with that, given, you know, obviously it's a hypothetical, a different scenario, but I think in that case, you have the intervention of something different, a drug that's administered by a human intervention that, you know, it's the drug that contributed to the death. You know, this is some latency in the body. Here, I think it's clear from the autopsy, from even the original death certificate and the independent medical examiner that her lung disease contributed in some way, and that's why Judge Mays found that path. I think here, MetLife, given all the evidence it had in front of it, made a reasonable decision. It's not arbitrary and capricious, and it should be affirmed, and I think the court is completely right about Dixon, and if the court writes an opinion, MetLife would appreciate the fact that O'Neill, in a Feglia case, the court has said what it said, which is we're not going to look to principles of equity or some sort of ideas from contracts or insurance. We're going to enforce the plain language of what is a federal policy. It's not insurance. It's not open to the market. It's not an employer who, if they don't like... Could you just address, and I'm sure you've got, you could just probably tick through this, but the differences in language between Dixon in this case, because the language is kind of similar. In Dixon, it says, which directly and from no other causes result in covered loss. So the language that OPM wrote and put in its contract, in any way contributed to, is in the exclusion? In the exclusion. In any way contributed to, is not in the language. If you look at my opponent's brief on page 15, he has the language excerpted in his brief from Dixon, if you don't have the opinion. My language is on pages 6 through 7 of the red brief, so you can compare and contrast. It's not the same language at all, and to add substantial into our exclusion when it says any way, it's not going to change it. And I guess, and I guess maybe that, and that goes to my, the point of my question, is, is it possible that the coverage provided in the contract is the same as Dixon, but for the exclusion? That you've got much, you've got this exclusion that says, in any way results from, is caused by, or is contributed to by a physical illness, and that that, you know, even if you said, look, the first part, the sort of the coverage part is the same as Dixon, this all really just turns on the exclusion? Well, Dixon is a private insurance policy that's written in sort of a three-step way. It has a coverage provision that's broad. It has a, what we call a giveth and then a taketh away coverage provision, and then there was an exclusion. And, and the court lays that out in its opinion on, on page, I think it's 1184, 389F3 at 1184. But the plain language here is, is, is different in ways that matter. I mean, isn't there also another issue, because that's an ERISA case, and this is a FEGLI case, and we have said, we have to strictly construe the FEGLI statute, right? Yes, Your Honor. And, and so, for any number of policies, even if it were exactly the same language, we, we might not be able to construe it exactly the same way if we didn't strictly construe it in Dixon. Now, if we did strictly construe it in Dixon, then yes, it would make sense that we would construe it the same way here. Yes, Your Honor, because an administrator in the ERISA context has a fiduciary obligation to the beneficiaries of the plan, even when they're administering benefits here, MetLife has an obligation to the federal government to do two things. It's set forth by OPM, it has to pay claims that completely comply with legal regulatory and contractual guidelines, and it's supposed to safeguard the FEGLI program assets against waste loss, unauthorized use, or misappropriation. So MetLife has an obligation to follow this federal policy to the letter, which it did, and we would ask the court to affirm. Thank you. All right. Thank you, counsel. And Mr. Williams, you've reserved three minutes. Yes, Your Honor, I guess first off, I want to look at what, how MetLife actually did administer this particular benefit in this situation. They looked at it from the strict interpretation standpoint, which is whether the injury cooperated in any way with a preexisting condition. They didn't look beyond these issues of causation or anything, just really just whether there was even any touching between the two, and you can see this within the claim process. So... But isn't that, isn't that part of the exclusion because it has that contributed to by length? So, I mean, the exclusion says, in any way results from, that's causation, caused by, that's causation, or is contributed to by a physical illness, and that contributed to by seems, that's not caused by, that's just, you know, did it have an effect on, was there something going on from the physical illness perspective? Yes, Your Honor, and I guess the essential question then is, what did really, what did Congress really intend with this? Did they mean to provide coverage at all? Did they mean for this to actually afford a benefit at all? And this is where it ties in to Dixon a bit because, you know, within ERISA, yes, there are fiduciary obligations, but those fiduciary obligations are also to the plan at large. Administrators can't just be profligate with paying benefits out because they deplete plan assets that would go to the benefit of others. And in Dixon, that was never, ERISA was not a driving pillar behind that case. The court analyzed that case in terms of the intent of the policy, just like Atkins did, the Fourth Circuit case that it followed, and then noting that it was ERISA said that, well, this is inconsistent with ERISA. So the spirit of Dixon is really what, is really what translates here, just like it does with any coverage. It just gets to the purpose. What is it trying to accomplish? What was Congress trying to accomplish with this coverage? Was it trying to just hold out false hope where it thought employees may just think they've got a benefit? What's an example, in your view, of a situation where some other cause could contribute to an injury or death and bring this kind of exclusion into play? What's an example of where that could happen? Right. Well, Your Honor, there's a lot of, I guess, if there was a malpractice, for example. Let's say in this instance, let's say Ms. Anderson bled out during surgery because, I don't know, didn't clamp an artery or maybe an artery was nicked. That would clearly be an intervening cause. And in that instance, I guess there would be a question whether the surgery would be an accident. So you're defining it as an intervening cause, right? Would it be anything beyond? Oh, in terms of something that defeats coverage? Right. Yes, Your Honor. Would anything beyond an intervening cause satisfy this language? Anything less than an intervening cause? Yes, Your Honor. Actually, I think something less than an intervening cause would because that's where it gets to substantially contribute to. I think when you look at what the court did in Dixon, substantial means something more than just de minimis, something more than just sort of nominal. It's something more than that. And I think ultimately it's a fact-specific determination. That's something that the administrator has to do and has to make. The problem in this case is it was never made. And it was put in front of the administrator to make, to try to reach that, but the court never did it. But would, I mean, to Judge Brasher's point about the exclusions, do you think that it's fair to say that your client's death was not contributed to by her physical illness? I mean, that's a harsh standard, and honestly, I would not sign up for this coverage given how limited it appears to be, but that exclusion, that exclusion rings pretty true here, at least to me. Just to make sure I understand Your Honor's question, are you asking do I think that at least her health conditions did not even contribute to her death? Oh, they increased her mortality. They'd increase anybody's mortality. If I have high blood pressure or circulatory disease, it's going to increase my mortality if I get injured as well. But it's the connection that has to be drawn. And that analysis just never occurred in this administrative process, and that inherently is the problem. All right. Thank you very much. Thank you, Your Honor. We are in recess. Actually, we're in adjournment. That's all right. All right. All right.